UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FIRST MARBLEHEAD CORPORATION, FIRST MARBLEHEAD EDUCATION RESOURCES, INC., and FIRST MARBLEHEAD DATA SERVICES, INC., <br><br> Appellants, <br><br> v. <br><br> THE EDUCATION RESOURCES INSTITUTE, INC., <br><br> Appellee. | Civil Action No. 11-10241 (DPW) |

**REPLY BRIEF OF APPELLANTS THE FIRST MARBLEHEAD CORPORATION,
FIRST MARBLEHEAD EDUCATION RESOURCES, INC., AND
FIRST MARBLEHEAD DATA SERVICES, INC.**

*By Their Counsel:*

Robert S. Frank, Jr. (BBO# 177240)
Douglas R. Gooding (BBO# 558976)
William S. McMahon (BBO# 651832)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
Tel: (617) 248-5000
Fax: (617) 248-4000

# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ ii

I.   THE BANKRUPTCY COURT DID NOT HAVE JURISDICTION TO
     RULE ON TERI'S POST-CONFIRMATION MOTION. ..................................... 2

     A.   The Bankruptcy Court Did Not Have Statutory Jurisdiction To
          Resolve The Parties' Contract Interpretation Dispute. .............................. 2

     B.   The Bankruptcy Court Did Not Have Ancillary Jurisdiction To
          Interpret The TSA. ..................................................................................... 6

     C.   Conclusion Regarding Jurisdiction. .......................................................... 13

II.  THE BANKRUPTCY COURT ERRED WHEN IT ALLOWED NO
     DISCOVERY, TOOK NO EVIDENCE, AND HELD THAT THE
     RESTRICTIONS IN THE TSA ON TERI'S USE OF THE ENHANCED
     DATABASE TERMINATED TWO YEARS AFTER THE REJECTION
     OF THE PARTIES' 2001 DATABASE AGREEMENT. ................................... 14

     A.   The Terms Of The TSA. ........................................................................... 14

     B.   TERI's Argument ...................................................................................... 16

     C.   The Bankruptcy Court's Ruling Accepting TERI's Contract
          Construction Argument Was Error. .......................................................... 17

          1.   The Context in Which the TSA was Negotiated ........................... 19

          2.   The Negotiation of the TSA ......................................................... 22

          3.   Post-Contractual Conduct. .......................................................... 23

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr.),
  410 F.3d 100 (1st Cir. 2005) ......................................................................3

BWI Liquidating Corp. v. Rialto (In re BWI Liquidating Corp.),
  437 B.R. 160 (Bankr. D. Del. 2010) ...........................................................4

Celotex Corp. v. Edwards,
  514 U.S. 300 (1995) ................................................................................ 2-3

Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.),
  266 F.3d 388 (5th Cir. 2001) .......................................................................4

In re G.S.F. Corp.,
  938 F.2d 1467 (1st Cir. 1991) ............................................................... 12-13

In re New Seabury Company Limited Partnership v. New Seabury Properties LLC (In re
  New Seabury Company Limited Partnership),
  450 F.3d 24 (1st Cir. 2006) .......................................................................12

Kokkonen v. Guardian Life Ins. Co. of America,
  511 U.S. 375 (1994) .......................................................................... *Passim*

Picard v. Cohmad Securities Corp (In re Bernard L. Madoff Investment Securities LLC),
  No. 09-1305, 2011 Bankr. LEXIS 3001 (Bankr. S.D.N.Y. February 3, 2011) .......................11

Polaroid Corp. v. Rollins Envtl. Servs.,
  416 Mass. 684 (1993) ................................................................................21

Resorts Int'l Financing, Inc. v. Price Waterhouse & Co., Inc. (In re Resorts Int'l, Inc.),
  372 F.3d 154 (3d Cir. 2004) .........................................................................4

Seahawk Seafoods Inc. v. Alaska (In re Valdez Fisheries Dev. Ass'n),
  439 F.3d 545 (9th Cir. 2006) .......................................................................10

Travelers Indemnity Co. v. Bailey,
  ___ U.S. ___, 129 S.Ct. 2195 (2009) .......................................................... 10-11


**STATUTES**

11 U.S.C. § 1125(a) and (b) .........................................................................23

28 U.S.C. § 1334 ........................................................................................2

This memorandum is filed in reply to the Brief of Appellee The Educational Resources Institute, Inc. ("TERI Br."). TERI's Brief is a studied effort at misdirection with respect to the legal issues, mischaracterization of the record, and avoidance of undisputed facts that undermine TERI's position.

Appellant The First Marblehead Corporation and its affiliates (collectively, "FMC") will demonstrate below that the Bankruptcy Court did not have jurisdiction, after it confirmed TERI's plan of reorganization, to resolve a contract interpretation dispute between TERI and FMC. The Bankruptcy Court did not have statutory jurisdiction to interpret the parties' Transition Services Agreement ("TSA") because (a) the outcome of the dispute would not affect either the bankruptcy estate or TERI's former creditors and (b) the parties' disagreement did not involve an interpretation of TERI's plan of reorganization. The Bankruptcy Court did not have ancillary jurisdiction to interpret and enforce the TSA. As the Supreme Court's decision in Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375 (1994), establishes, the fact that the Bankruptcy Court had issued an Order that authorized TERI to enter into the TSA, did not give the Bankruptcy Court jurisdiction, after plan confirmation, to interpret or enforce that Order.

If this Court were to reach the merits of the parties' contract interpretation dispute, it should conclude that the Bankruptcy Court could not permissibly have construed the TSA in TERI's favor without considering evidence relating to the context in which the TSA was negotiated, the actual negotiations leading to the TSA, and the parties' conduct under the TSA. The result reached by the Bankruptcy Court is inconsistent with the terms of the TSA, as they were presented to the Bankruptcy Court at the time when it authorized TERI to enter into the TSA. The result is also implausible in view of the circumstances that existed at the time that the TSA was negotiated and inconsistent with the conduct of the parties after the TSA was executed.

FMC addresses the jurisdiction issue first because it is dispositive of this appeal.

## I. THE BANKRUPTCY COURT DID NOT HAVE JURISDICTION TO RULE ON TERI'S POST-CONFIRMATION MOTION.

### A. The Bankruptcy Court Did Not Have Statutory Jurisdiction To Resolve The Parties' Contract Interpretation Dispute.

The Bankruptcy Court's jurisdiction is defined and limited by statute. 28 U.S.C. § 1334; Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995). The Bankruptcy Court's jurisdiction extends only to (a) proceedings initiated by the filing of a petition under the Bankruptcy Code (a "proceeding under" the Bankruptcy Code; *e.g.*, a Chapter 11 reorganization), (b) causes of action created by the Bankruptcy Code ("arising under" jurisdiction), (c) matters that have "no existence outside" a bankruptcy proceeding ("arising in" jurisdiction), and (d) matters that could have some effect on a bankruptcy estate ("related to" jurisdiction). Opening Brief of Appellants ("FMC Mem.") at 19-21.

The dispute that underlies this case is a garden variety contract interpretation dispute. TERI sought a declaration of its rights under a business contract between FMC and TERI. TERI's Post-Confirmation Motion was not a petition under, or a claim created by, the Bankruptcy Code. And, contract interpretation disputes are regularly adjudicated outside of bankruptcy proceedings.

Further, TERI chose to file its motion requesting an interpretation of the TSA after TERI's plan of reorganization (the "Plan" or "TERI's Plan") was confirmed. At the time that the Bankruptcy Court ruled on TERI's Post-Confirmation Motion, (1) TERI was no longer a "debtor;" (2) the TERI bankruptcy estate no longer existed; (3) the Bankruptcy Court's interpretation of the TSA could not affect the TERI bankruptcy estate; and (4) the resolution of the dispute could have no effect on the rights of any former creditor of TERI. (Indeed, counsel for the Creditors' Committee expressly so informed the Bankruptcy Court. Record 97 at 2; Record 93 at 8:8-13.) Moreover, to the extent that it is relevant, TERI expressly represented to the Bankruptcy Court that its business would be viable post-bankruptcy, even in what TERI

projected as its "worst case scenario," and even if the parties' contract interpretation dispute were resolved *in FMC's favor*. Record 93 at 8:24-9:11. In thirty-three pages of often irrelevant argumentation, TERI never contests, indeed never mentions, these immutable facts.[1]

After its plan of reorganization has been confirmed, a former debtor must succeed or fail on its merits without the continuing protection of, and without continuing access to, the bankruptcy courts. The fact that a bankruptcy court previously authorized a debtor to enter into a contract (or to assume a pre-petition contract) does not give a bankruptcy court jurisdiction to interpret or enforce that contract after plan confirmation, and, thus, after the bankruptcy estate no longer exists. FMC Mem. at 19-20. "Bankruptcy courts have no jurisdiction over proceedings" -- like the present dispute between the parties -- "that have no effect on the estate of the debtor." Celotex, 514 U.S. at 308; Boston Reg'l Med. Ctr., Inc. v. Reynolds (In re Boston Reg'l Med. Ctr.), 410 F.3d 100, 105-06 (1st Cir. 2005) (Once a reorganized debtor emerges from bankruptcy, "it is just like any other corporation; it must protect its interest in the way provided by the applicable non-bankruptcy law." Continued access to the bankruptcy court "would work an unwarranted expansion of federal court jurisdiction [and] also would unfairly advantage reorganized debtors by allowing such firms to funnel virtually all litigation affecting them into a

---

[1] TERI has itself to blame for the fact that its Post-Confirmation Motion was considered and decided after its plan of reorganization was confirmed and had become effective. TERI chose to wait until after its plan of reorganization had been confirmed to file a motion seeking an interpretation of the TSA. When FMC received TERI's motion, it requested a short extension of the time to file objections to that motion. Record 96. The Creditors' Committee independently requested a delay. It asked specifically that "any further litigation on the Motion be deferred until after the Effective Date" of the Plan. Record 97 at 2-3. In its response, TERI made clear that it was not asking, and would not ask, for a postponement of the effective date of the Plan pending a decision of its Post-Confirmation Motion. Record 98 at 2. The Bankruptcy Court then granted FMC a six-day extension of the time to file its Objection to TERI's motion (from November 16 to November 22, 2010). Compare Record 96 at 1 with Record 99. Thus, the timing of TERI's Post-Confirmation Motion, of the Bankruptcy Court's consideration of that motion, and of the Bankruptcy Court's Post-Confirmation Order were the result of TERI's own tactical choices. It was not attributable to FMC's conduct.

single federal forum") (internal quotations omitted); <u>Resorts Int'l Financing, Inc. v. Price Waterhouse & Co., Inc. (In re Resorts Int'l, Inc.)</u>, 372 F.3d 154, 164-65 (3d Cir. 2004).[2]

TERI contests none of these legal principles.[3] TERI argues that an adverse resolution of the parties' contract dispute "would seriously threaten TERI's future success" (TERI Br. at 2), and, alternatively, that a favorable resolution will make TERI a more successful business (TERI Br. at 11). These arguments are beside the point. Once TERI's Plan was confirmed, TERI's future success or failure was irrelevant to the resolution of a dispute about the terms of a business contract. TERI was surely entitled to seek a resolution of such a dispute, but it was required to do so in the same way in the same forum, and subject to the same requirements as any other business. It was required to commence a civil action in the courts of the Commonwealth of Massachusetts.

Further, no question relating to the interpretation of TERI's confirmed Plan was at issue before the Bankruptcy Court, or can be at issue in this Court. In its Post-Confirmation Motion, TERI did *not* ask the Bankruptcy Court to interpret its Plan. Record 95. And, in its Post-Confirmation Order, the Bankruptcy Court did *not* purport to interpret the TERI Plan. Record 106, 107. That was for good reason. The parties identified what they called the "Database Dispute" prior to Plan confirmation. Record 84 at 5, n.5, and at Ex. A (Stipulation) at 2, 4, 5. They *stipulated* that nothing in the Plan was intended to affect that dispute. Record 84, Ex. A

---

[2] TERI states that it sought to "retain the benefit of proceedings that could only arise under the Bankruptcy Code . . . approval of the TSA . . ." (TERI Br. at 18) and that "the jurisdiction to entertain the [Post-Confirmation] Motion For Interpretation is derivative of the Bankruptcy Court's undisputed jurisdiction to enter the [Rejection] Order" (TERI Br. at 16). Thus, TERI argues that a former debtor may return to a bankruptcy court after its plan of reorganization has been confirmed and may ask the bankruptcy court to enforce a contract that the bankruptcy court once authorized the former debtor to enter. <u>Id</u>. TERI cites no case that supports its assertion, and a legion of cases hold otherwise. <u>See, e.g.</u>, <u>Craig's Stores of Texas, Inc. v. Bank of Louisiana (In re Craig's Stores of Texas, Inc.)</u>, 266 F.3d 388, 391 (5th Cir. 2001).

[3] TERI's observation that the Bankruptcy Court's Post-Confirmation Order was entered "shortly after" Plan confirmation (TERI Br. at 15) is irrelevant. <u>BWI Liquidating Corp. v. Rialto (In re BWI Liquidating Corp.)</u>, 437 B.R. 160, 166-67 (Bankr. D. Del. 2010) (holding that the length of time between the date of confirmation and the commencement of a proceeding is irrelevant for jurisdictional purposes; the bankruptcy court's jurisdiction narrows immediately after confirmation).

(Stipulation) at 7.  The Bankruptcy Court approved that stipulation (the "Stipulation").  It expressly ordered the parties to comply with the terms of the Stipulation.  Record 92 at 2.

The TERI Plan itself states that nothing in the Plan would affect the parties' rights under the TSA.  Record 79 at § 12.1(d).[4]  The Bankruptcy Court's later Order approving TERI's Plan (Record 94) expressly states (1) that the terms of the Stipulation (carving out the Database Dispute as an unresolved issue) supercede both the terms of TERI's Plan and the terms of the Order approving the TERI Plan, and (2) that, in the event of an inconsistency between the provisions of the TSA (as it might thereafter be interpreted by a court of competent jurisdiction) and the Plan or the Order, "the provisions of the TSA . . . shall govern."  Record 94 at 29-30.

In short, the parties agreed, and the Bankruptcy Court ordered, that the resolution of their dispute regarding the interpretation of the TSA would be independent of, and not affected by, the terms of TERI's Plan.  The parties' contract dispute does not affect the implementation or administration of the Plan.  The repeated suggestion in TERI's Brief (at, *e.g.*, 10, 12, and 14) that the Bankruptcy Court's Post-Confirmation Order was actually an interpretation of TERI's Plan both is (a) belied by a reading of the Court's Opinion (Record 106) and its Order (Record 107), which properly make no mention of the terms of the Plan, and (b) inconsistent with the express terms of the Plan itself.  TERI's arguments (TERI Br. at 10), grounded on the terms of the TERI Plan, are a diversion, and a violation of the Bankruptcy Court's Order requiring the parties to comply with their own Stipulation.

Therefore, the Bankruptcy Court had no statutory jurisdiction to interpret the TSA after it confirmed TERI's plan of reorganization.  Apart from two conclusory sentences scattered in its brief, TERI does not assert otherwise.  TERI Br. at 14, 22.  Moreover, and respectfully, this

---

[4] In a maneuver that is representative of the candor of the arguments in TERI's Brief, TERI cites Section 12.1(c) of the Plan in support of its Plan-based argument about "Data" (TERI Br. at 10), but fails to note the immediately succeeding Plan provision, Section 12.1(d), which renders irrelevant TERI's argument based on the language of the Plan.

Court does not have jurisdiction to resolve the parties' contract dispute. No federal question is presented. There is no diversity of citizenship. In these circumstances, the only forum for the resolution of the parties' contract interpretation dispute is state court.

## B.     The Bankruptcy Court Did Not Have Ancillary Jurisdiction To Interpret The TSA.

TERI's primary argument addressed to jurisdiction is that a court, including a bankruptcy court, has jurisdiction to interpret its own orders. TERI Br. at 1, 15, and 16. That principle does not support the Bankruptcy Court's exercise of jurisdiction in this case. The context is as follows:

The Rejection Motion. In June 2008, TERI filed a motion in the Bankruptcy Court (the "Rejection Motion") requesting (a) authority to reject its pre-existing contracts with FMC and (b) "authority to enter into" the TSA. Record 3 at 2, 17. The seventeen-page Rejection Motion focused on the critical cost savings that TERI would achieve if its motion were allowed. The Motion mentioned data or the Loan Database only once and only in passing. Record 3 at 8 ("Going forward the TSA will govern with respect to the Loan Database (as [that term is] defined in the Database Agreement)." Although TERI states that the Rejection Motion "fully described" all of the "principal terms of the TSA" (TERI Br. at 8 and 17), the Motion said nothing at all about the scope or duration of the restrictions on TERI's use of any database -- the issue that is now in dispute between the parties.

The Materials That Accompanied The Rejection Motion. TERI attached a copy of the TSA to its Rejection Motion. It did not attach a copy of the parties' 2001 Database Agreement. Thus, TERI did not provide to the Bankruptcy Court the contractual provision that, after Plan confirmation, it asked the Bankruptcy Court to interpret. Consequently, at the time when TERI sought, and the Bankruptcy Court granted, authority to enter into the TSA, it was literally impossible for the Bankruptcy Court to have considered (much less approved or ordered

compliance with) the contract provision that TERI asked the Bankruptcy Court to interpret in TERI's Post-Confirmation Motion filed two and one-half years later. In fact, the 2001 Database Agreement -- and, therefore, the provision on which TERI placed reliance in its Post-Confirmation Motion -- was not made part of the record in the Bankruptcy Court at any time prior to Plan confirmation.

The Hearing On The Rejection Motion. At the hearing in June 2008 on TERI's Rejection Motion, TERI's counsel said nothing about the now disputed restrictions on TERI's use of the relevant database. Indeed, he did not mention the database at all. Record 17 (Hearing Transcript). Instead, TERI argued that the Court should allow TERI to reject the parties' 2001 Database Agreement and the other pre-existing TERI/FMC contracts, and authorize TERI to enter into the TSA, on the ground that the substitution of the TSA for the pre-existing TERI/FMC contracts would allow TERI to save millions of dollars each month, and was, therefore, a permissible exercise of TERI's business judgment. No more stringent standard, TERI argued, should be applied. Record 3 (TERI Motion) at 15; Record 17 (Hearing Transcript) at 12.

The 2008 Rejection Order. On June 23, 2008, the Bankruptcy Court entered an Order (the "Rejection Order") in the form proposed by TERI. Record 16. The Order said that the pre-existing "FMC Contracts are rejected effective May 31, 2008" and that "the debtor is *authorized to enter* into the Transition Services Agreement, as amended between the Debtor and the FMC Entities," which would be effective from "June 1, 2008 forward." Record 16 (Order Granting Motion (A) . . . *Authorizing* The Debtor To Reject Certain Contracts . . . And (B) . . . *Authorizing* The Debtor To Enter Into A Transition Services Agreement) at 1, 2; see also TERI Br. at 1 (The June 23, 2008 Order "authorized TERI . . . to enter into the . . . TSA"). The Court retained jurisdiction to "construe and enforce the terms *of this Order*." Record 16 at 2 (emphasis supplied). The Court did not attach a copy of the TSA to its Order. The Order did not

incorporate the terms of the TSA or state that the Bankruptcy Court retained jurisdiction to construe or enforce the TSA.

TERI observes that a court has ancillary jurisdiction to interpret and enforce its own prior orders. TERI Br. at 1, 15, 16. The principle is indisputable. It applies to all courts. It is not unique to bankruptcy proceedings. However, it does not support the Bankruptcy Court's exercise of jurisdiction in this case. The Bankruptcy Court could properly interpret its June 23, 2008 Rejection Order. But, the scope of the Bankruptcy Court's Rejection Order is established by the words of the Order. The Rejection Order merely authorized TERI to enter into the TSA. Record 16. The Court retained jurisdiction "to construe and enforce the terms of this Order" -- nothing more. TERI did enter into the TSA. There is nothing about the Rejection Order that, post-Plan confirmation, required interpretation, and nothing that needed enforcement. Record 16. Because the Bankruptcy Court's Order did not incorporate *the TSA* or state that the Bankruptcy Court retained jurisdiction to construe and enforce *the TSA*. The Bankruptcy Court did not have jurisdiction after it confirmed TERI's Plan (and the TERI bankruptcy estate no longer existed) to interpret or enforce the TSA.

In <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375 (1994), the Supreme Court explained that an order approving the terms of an agreement between two litigating parties does not suffice to make the terms of that agreement part of the court's order, and does not afford that court later ancillary jurisdiction to interpret or enforce the approved agreement. In words that could not be clearer, the Court held that in order to retain jurisdiction to interpret or enforce an agreement that it approved, a court must either incorporate the terms of that agreement into the Court's Order itself, or it must include in its order a provision retaining jurisdiction over the approved agreement. "In that event, a breach of the agreement would be a violation of the order and ancillary jurisdiction to enforce the agreement would therefore exist. In the absence of such

a provision in the court's order, ancillary jurisdiction to enforce the agreement *does not exist*." Kokkonen, 511 U.S. at 381 (emphasis supplied). FMC Mem. at 22-23.[5]

The June 23, 2008 Rejection Order is part of the Record. It is quoted in full at p. 14 of FMC's prior memorandum. It does not incorporate the terms of the TSA, does not order compliance with the TSA, and does not purport to retain jurisdiction over the TSA. TERI's assertion (TERI Br. at 8) that the Rejection Order (TERI calls it the "Contracts Order") "expressly included the 'principal terms' of the TSA" is flatly false, and is completely unsupported by the citation proffered by TERI.[6] TERI's reference to what TERI says is "[t]he Order's actual two year restriction on TERI's use of the data" (TERI Br. at 2) exceeds the bounds of legitimate argument. The Order says nothing about a restriction on TERI's use of any data. TERI's assertion (TERI Br. 18) that the Rejection Order "retain[ed] jurisdiction to construe and enforce" the TSA is simply incorrect (and unsupported by any purported citation).

By contrast, many other orders of the Bankruptcy Court entered during the TERI bankruptcy proceeding did require compliance with an underlying agreement of the parties. For example, Record 24 (Order Granting Motion Authorizing Debtor To Enter Into Stipulation For The Termination Of Certain Of Debtor's Student Loan Programs):

> ORDERED, that the Debtor is permitted to enter into *and shall perform* the Stipulation; and it is further
>
> \*      \*      \*
>
> ORDERED, that U.S. Bank is hereby *directed to comply with* the terms of paragraph 1(b)(ii) of the Stipulation . . . [emphasis supplied].

---

[5] TERI attempts to distinguish Kokkonen on the ground that Kokkonen was not a bankruptcy case. TERI Br. at 16. However, the doctrine of ancillary jurisdiction -- the theory on which the Bankruptcy Court relied in this case -- applies equally to all courts, bankruptcy and non-bankruptcy. Further, as the cases cited at pp. 28-30 of FMC's prior brief establish, the holding of Kokkonen has regularly been applied in bankruptcy cases.

[6] TERI's further statement that "no permanent restriction [on TERI's use of the enhanced database] appears on the face of the [Rejection] Order" (TERI Br. at 2) is narrowly truthful, but misleading. The Rejection Order does not incorporate *any* term of the TSA.

Record 26 (Order Granting Motion For Order Authorizing Debtor To Enter Into Stipulation For

The Termination Of Certain Of Debtor's Student Loan Programs):

> ORDERED, that the Debtor is permitted to enter into *and shall perform* the Stipulation . . . [emphasis supplied].

Record 92 (Order Authorizing Debtor . . . To Enter Into Stipulation Resolving Claims):

> ORDERED, that the Motion is granted and the Stipulation is approved, and it is further
>
>         *        *        *
>
> ORDERED, that *the parties are directed to comply with* the terms of the Stipulation . . . [emphasis supplied].

Record 94 (Plan Confirmation Order):

> 2.      The August 2010 Plan is approved and confirmed . . . .  The Terms Of The August 2010 Plan and the Plan Supplement are *incorporated by reference into* . . . this Confirmation Order [emphasis supplied].

Thus, when the Bankruptcy Court intended to incorporate the terms of another document into its

Order, and when it intended to order compliance with an agreement that it was approving, it did

so with great clarity.  The Rejection Order contains no comparable provision.  As a result, the

Bankruptcy Court did not have jurisdiction, after Plan confirmation, to interpret or enforce the

TSA.[7]

The cases cited by TERI do not alter this analysis.  TERI places principal reliance on

<u>Travelers Indemnity Co. v. Bailey</u>, ___ U.S. ___, 129 S.Ct. 2195 (2009).  TERI Br. at 15.  In

<u>Travelers</u>, a bankruptcy court entered an order in 1986 that (1) approved agreements settling

---

[7] Among the diversions in TERI's Brief is the argument that the TSA states that it is a condition of the effectiveness of the TSA that the Bankruptcy Court "approve" the TSA.  TERI Br. at 8-9.  First, as <u>Kokkonen</u> makes clear, the mere "approval" of the TSA by the Bankruptcy Court, if it had occurred, would not give that court the power later to interpret or enforce the TSA.  Second, TERI sought, and obtained, authorization to enter into the TSA.  It did not seek "approval" of the TSA.  It argued only that its decision to enter into the TSA satisfied the relatively low standard established by the business judgment rule.  Record 3 at ¶¶ 24-26.  Third, for the purpose of determining the Bankruptcy Court's jurisdiction, it does not matter what the TSA says; it matters what the Court's Rejection Order said.  <u>Seahawk Seafoods Inc. v. Alaska (In re Valdez Fisheries Dev. Ass'n)</u>, 439 F.3d 545, 550 (9th Cir. 2006) (<u>see</u> FMC Mem. at 28-29).

claims against Travelers, and (2) enjoined all lawsuits by third parties against Travelers (and others) relating to the insurance policies under which Travelers had insured the bankrupt (Johns-Manville Corp.).  Later, fresh claims were brought against Travelers asserting new theories of liability.  Travelers filed a motion in the bankruptcy court to enjoin the pursuit of those claims.  The bankruptcy court then interpreted and enforced its own prior injunction.  It ruled that its prior injunction precluded the plaintiffs from asserting their new theories.  The Supreme Court held that the bankruptcy court's 1986 order was final and not subject to collateral attack, that the bankruptcy court's interpretation of its original injunction was correct, and that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."

Thus, the decisions in Kokkonen and Travelers are consistent with each other.  A court may enforce its own orders, but it may not enforce an agreement of the parties that it approved unless that agreement is expressly made a part of its order.  Further, Travelers illustrates what the present case is not.  In Travelers, the bankruptcy court interpreted and enforced its own prior order, which, in turn, implemented the critical aspects of the parties' settlement agreement.  In this case, the Rejection Order did not incorporate the terms of the TSA, either directly or by reference.  It merely authorized TERI to enter into the TSA.  The Bankruptcy Court's Post-Confirmation Order did not actually interpret the Bankruptcy Court's prior Rejection Order, it interpreted the TSA, which was not a part of its Rejection Order.  Kokkonen establishes that, in these circumstances, the Bankruptcy Court did not have ancillary jurisdiction to interpret the TSA.[8]

---

[8] The bankruptcy court decision in Travelers, quoted at p. 15 of TERI's brief, was rendered by the same judge that decided Picard v. Cohmad Securities Corp (In re Bernard L. Madoff Investment Securities LLC), No. 09-1305, 2011 Bankr. LEXIS 3001 (Bankr. S.D.N.Y. February 3, 2011), which held, relying on Kokkonen, that the court had no jurisdiction to enforce a settlement agreement merely because the agreement had been approved by the court.  In Madoff, unlike Travelers, the court had not entered an order that retained jurisdiction over the settlement, or incorporated the terms of the settlement in the order.  Thus, the judge made the distinction that is required by Kokkonen.  A court may enforce its own prior order, but it does not have ancillary jurisdiction to enforce an agreement that is not incorporated, in some way, in its prior order.

TERI cites <u>In re New Seabury Company Limited Partnership v. New Seabury Properties</u> <u>LLC (In re New Seabury Company Limited Partnership)</u>, 450 F.3d 24 (1st Cir. 2006), but the <u>New Seabury</u> decision did not address issues of bankruptcy court jurisdiction, probably because the parties had agreed that the bankruptcy court could resolve their dispute.  450 F.3d at 27.  By contrast, the parties in this case did not agree to submit the interpretation of the TSA to the Bankruptcy Court.  Record 84, Ex. A (Stipulation), ¶ 13.  TERI's argument (TERI Br. 19-20), relying on <u>New Seabury</u>, does not explain how <u>New Seabury</u> is relevant to the jurisdiction issue in this case.

Finally, TERI cites <u>In re G.S.F. Corp.</u>, 938 F.2d 1467 (1st Cir. 1991).  In <u>G.S.F.</u>, the parties (each creditors of a bankruptcy estate) entered a stipulation settling their dispute and releasing all claims against each other.  The bankruptcy court then "incorporated" the stipulation "by reference" into its order dismissing their case.  <u>Id</u>. at 1471; TERI Br. at 20.  Thereafter, one of the parties sued the other.  At the request of the defendant in the new case, the bankruptcy court enjoined the plaintiff from pursuing the new action.  As TERI states (TERI Br. at 20), the First Circuit upheld that injunction on the ground that the bankruptcy court could enforce its own prior order which, in turn, incorporated the parties' stipulation releasing each other from all claims.[9]  In the present case, however, the 2008 Rejection Order did not incorporate the TSA by reference, or otherwise.  Thus, the Bankruptcy Court did not have ancillary jurisdiction, after Plan confirmation, to interpret or enforce the TSA.  <u>Kokkonen</u>, 511 U.S. at 381.[10]

---

[9] The Bankruptcy Court cited <u>G.S.F.</u> for the proposition that "where the bankruptcy court had jurisdiction to approve [a] settlement, jurisdiction over subsequent litigation involving [that] settlement was based on the inherent power of the court to protect a federal judgment . . . ."  Record 106 at 7, n.5.  The Bankruptcy Court misunderstood the holding in <u>G.S.F.</u>  The Bankruptcy Court had jurisdiction to enforce its own prior order in <u>G.S.F.</u> because that order actually incorporated the relevant terms of the parties' settlement agreement, not because the Bankruptcy Court had approved the settlement.

[10] The Bankruptcy Court's exercise of jurisdiction in <u>G.S.F.</u> was also based on the <u>G.S.F.</u> court's finding that its ruling would affect the bankruptcy estate, which, at the time of that finding, remained open.  In the present case, at the time of the Bankruptcy Court's Post-Confirmation Order, the bankruptcy estate no longer existed, and the Bankruptcy Court's Order could not affect the bankruptcy estate.

### C.       Conclusion Regarding Jurisdiction.

On October 29, 2010, the Bankruptcy Court confirmed TERI's plan of reorganization. The Plan became effective. By December 14, 2010, when it issued its Post-Confirmation Order, the Bankruptcy Court had no statutory jurisdiction to resolve a contract interpretation dispute between TERI and FMC. The resolution of the parties' dispute had, and could have, no effect on creditors, and no effect on the former bankruptcy estate. Moreover, there was nothing relevant in TERI's Plan to interpret or enforce. The parties' contract disagreement was identified prior to Plan confirmation and was expressly carved out of the Plan.

The Bankruptcy Court did not have ancillary jurisdiction to interpret or enforce the TSA. The Bankruptcy Court's June 23, 2008 Rejection Order is clear. The Court authorized TERI to reject its pre-existing contracts with FMC as of May 31, 2008, and authorized TERI to enter into the TSA, retroactive to June 1, 2008. The Court did not incorporate the TSA into its Order and did not purport to retain jurisdiction over the TSA. No amount of unsupported argumentation can change the words of the Rejection Order. The Order said what it said. See In re G.S.F. Corp., 938 F.2d at 1479 ("[we] are mindful of the Supreme Court's admonition . . . that it is our task to determine 'what the federal court order actually said,' without relying on the lower court's opinion as to what was intended") (internal citation omitted).

As a matter of law, the Bankruptcy Court did not have jurisdiction, post-confirmation, to resolve the parties' contract dispute. It should have denied TERI's motion on that ground and stopped there. This Court should so hold, should vacate the Bankruptcy Court's December 14, 2010 Order, and should dismiss this case. It need go, and should go, no further.

**II.  THE BANKRUPTCY COURT ERRED WHEN IT ALLOWED NO DISCOVERY, TOOK NO EVIDENCE, AND HELD THAT THE RESTRICTIONS IN THE TSA ON TERI'S USE OF THE ENHANCED DATABASE TERMINATED TWO YEARS AFTER THE REJECTION OF THE PARTIES' 2001 DATABASE AGREEMENT.**

If this Court reaches merits of the parties' contract interpretation dispute -- and for the reasons stated above, it should not -- the Court should reverse the Bankruptcy Court's ruling on that issue.

**A.  The Terms Of The TSA.**

Section 2.1 of the TSA (Record 3, Ex. A at 3) states that FMC will provide a Loan Database to TERI.  It states that the database contains two classes of data:  "data [that] has been received by TERI solely in connection with its business as loan guarantor . . . and is data owned by TERI *and* a copy of the data identified on Appendix E" (emphasis supplied).  Appendix E lists a variety of data, including data that was not "owned by TERI."  Record 3, Ex. A, at § 2.1, App. E.  The sum of the data "owned by TERI" and the additional data provided by FMC is referred to in FMC's prior brief as the "enhanced database."  Section 2.1 provides that the transfer of the enhanced database was to occur at "TERI's sole cost determined according to Schedule D."  Under Schedule D, TERI was only required to reimburse FMC on a "time and materials basis" for the cost of physically transferring the database to TERI.  Record 3, Ex. A, at App. D, p. 11.  TERI did not agree to pay (and did not, in fact, pay) anything more in order to obtain a copy of the enhanced database.

Section 2.1 of the TSA further states that the Loan Database transferred to TERI by FMC is to "remain subject to" Section 2.03 of parties' 2001 Database Agreement.  That provision allowed TERI to use the enhanced database for some purposes and not for others.  On the one hand, Section 2.03 of the 2001 Database Agreement *permitted* TERI to use the Loan Database "for its own use for purposes of designing, underwriting, implementing, evaluating, and managing education loan guarantee programs offered and guaranteed by TERI."  Record 95,

Ex. 2, at § 2.03; TERI Br. at 5-6, n.5.[11]  On the other hand, that provision *prohibited* TERI from "sell[ing], licens[ing] or transfer[ring] the Loan Database or any substantial portion thereof" to third party, or disclosing the Loan Database to a third party for any purpose other than supporting an education loan program guaranteed by TERI.  By 2008, when the TSA was executed, TERI had been operating under this set of ground rules since 2001 -- a period of more than seven years.  Record 95, Ex. 2, at § 2.03.

Section 3.13 of the TSA (Record 3, Ex. A at 6) states that the terms of "Article II [including Section 2.1] shall survive termination of this agreement."  No time limit was placed on this seemingly unambiguous "survival" provision.

Thus, on the face of the TSA -- the only agreement that was presented to the Bankruptcy Court when it was asked to authorize TERI to enter into the TSA -- the restrictions on TERI's use of the enhanced database were permanent.  TERI asserts (TERI Br. at 18), and the Bankruptcy Court stated (Record 106 at 8), that the Bankruptcy Court carefully reviewed the TSA in 2008 when it entered the Rejection Order.  Accepting that representation as correct, the Bankruptcy Court could only have concluded in 2008 that the restrictions on TERI's use of the enhanced database were permanent.  TERI submitted no document, and made no statement, to the Bankruptcy Court in 2008 that would have permitted (or even suggested) any other possible interpretation of the TSA.  On the assumption that the Bankruptcy Court could properly reach the merits of the parties' contract dispute, the Bankruptcy Court should have concluded that TERI presented all relevant documents to the Court with its Rejection Motion and that, based upon the unambiguous terms of the documents that TERI deemed relevant, the restrictions on TERI's use of the enhanced database were permanent.

---

[11] TERI's repeated statements (*e.g.*, TERI Br. at 1) that FMC contends that the TSA prevents TERI from using "the valuable data that TERI had accumulated over 20 years" and is an attack on a straw man.  FMC makes no such contention.  The TERI data in the Loan Database is data obtained by TERI "in connection with its business as a loan guarantor."  TERI Br. at 5, n.4.  The TSA allows TERI to use the enhanced database in connection with a TERI loan guarantee business.  Thus, the nature and source of the data and the restrictions on its use are co-extensive.

**B.      TERI's Argument.**

TERI bases its argument on a term in the parties' 2001 Database Agreement that TERI did not present to the Court when it sought authorization to enter into the TSA.  TERI observes that Section 2.1 of the TSA subjects TERI's use of the Loan Database to certain "additional" terms.  The additional terms are those terms that "pursuant to section 10.01 of the Database Agreement survive termination of such agreement."  Record 3, Ex. A, at § 2.1.  Section 10.01 is the provision of the 2001 Database Agreement that causes particular obligations of the parties stated in other parts of the 2001 Database Agreement (called "Surviving Obligations") to survive, but limits the period of their survival to a "period of two years after the termination date" of the 2001 Database Agreement.  Record 95 at ¶ 12, Ex. 2, § 10.01.  It is undisputed that *the* termination date of the Database Agreement is June 20, 2011, and that the date that is two years after *the* termination date is June 20, 2013.

TERI argues that Section 10.01 of the Database Agreement is a "Surviving Obligation" within the meaning of the 2001 Database Agreement, even though Section 10.01 does not itself impose any affirmative obligation -- surviving or otherwise -- on any party.  It is a provision that merely caused other parts of the 2001 Database Agreement to survive.  TERI then argues that the survival period established by Section 10.01 of the 2001 Database Agreement does not extend until June 2013 -- two years after *the* termination date of the 2001 Database Agreement. According to TERI, the survival period ended on May 31, 2010 -- three years earlier.  TERI's theory is that, by rejecting the 2001 Database Agreement, TERI terminated TERI's obligations under the 2001 Database Agreement in May 2008, and that two years after May 2008 is May 2010.  TERI makes this argument even though, as a matter of law and as FMC states in its prior memorandum, the rejection of a contract in bankruptcy does not relieve the *debtor* of its obligations under the rejected agreement.  It only relieves the debtor of the requirement that it make payments under the rejected contract and rejection of a contract releases the non-debtor

16

contracting party (here, FMC) from performing under that contract. See FMC Mem. at 41-42. Consistent with this basic principle of bankruptcy law, the Bankruptcy Court's Rejection Order states that "[t]he FMC Contracts are rejected" (not terminated), and that *"[t]he FMC Entities may treat each of the FMC Contracts as terminated as of May 31, 2008"* (emphasis supplied).[12] The Rejection Order does not state that TERI "may treat" any FMC Contract as terminated. TERI makes no response to this well-established precept of bankruptcy law.

Finally, TERI asserts that Section 3.13 of the TSA (the survival provision) is meaningless. According to TERI, Section 3.13 of the TSA actually adds nothing to Section 10.01 of the 2001 Database Agreement, which, TERI states, is incorporated into the TSA by an earlier provision -- Section 2.1 of the TSA -- and which, TERI states, is controlling. Both provisions, TERI contends, cause the restrictions on TERI's use of the database to continue only for two years. TERI offers no explanation as to why, if that were the parties' intention, they failed to state that understanding expressly in the TSA or why the survival provision on the face of the TSA included no time limit if it really meant that the provisions of Article II would only survive for two years.[13]

### C. The Bankruptcy Court's Ruling Accepting TERI's Contract Construction Argument Was Error.

This Court need not address the merits of TERI's spectacularly illogical contract interpretation argument. If it reaches this issue at all, it need only decide that the TSA is sufficiently ambiguous -- that TERI's proposed construction is not so clearly right -- that a court

---

[12] In yet another misstatement of the record, TERI states that the Rejection Order "stated that the FMC Contracts . . . were deemed terminated as of May 31, 2008." TERI Br. 25. In fact, as quoted above, the Rejection Order said that the "FMC Entities may treat the FMC Contracts as terminated . . . ." There is a material difference which TERI's selective quotation conceals.

[13] TERI also offers no explanation for its interpretation that certain provisions of the 2001 Database Agreement that are incorporated by reference into the TSA -- *e.g.*, Section 2.01 granting FMC ownership of the database -- are permanent in nature, but other provisions that are incorporated into the TSA by the same phrase in the same sentence -- *e.g.*, Section 2.03, which contains the restrictions on TERI's use of the database -- are time-limited in nature.

could not properly adopt TERI's construction without allowing any discovery and without considering any evidence.

FMC sets forth below additional factual considerations that make TERI's proposed contract interpretation extremely implausible. At the outset, however, four observations should be made. First, neither party should expect, or ask, this Court to find facts in the context of an appeal from a bankruptcy court decision. The facts stated below are merely designed to show that, at an evidentiary hearing, the evidence of commercial context, pre-contractual negotiations and post-contractual conduct will strongly support FMC's interpretation of the TSA.

Second, TERI argues that the factual statements in FMC's initial brief are not supported by the record. FMC will demonstrate below that TERI's assertion is incorrect. However, even if TERI's assertion were accepted, it would be false criticism. The core point is that FMC requested an opportunity to present evidence (Record 101 at ¶ 84) and the Bankruptcy Court erroneously declined to take any evidence. Thus, TERI's criticism that a particular fact is unsupported by evidence of record tends to illustrate the Bankruptcy Court's error; it does not support the Bankruptcy Court's decision.

Third, having criticized FMC incorrectly for stating facts that are not in the record, TERI then asserts an array of supposed facts for which there is no record support, and, typically, there is not even supporting citation in TERI's brief. In fairness, the point made above applies here as well. TERI should be permitted to try to prove what it says are facts -- but in a state court proceeding.

Fourth, the disputes of fact that are apparent from a comparison of FMC's and TERI's briefs suggest only that the parties' conflicting versions of the facts should be resolved by a court -- albeit not this Court -- and they demonstrate the need for (and the Bankruptcy Court's error in refusing to allow) discovery and the presentation of evidence to a court of competent jurisdiction.

### 1. The Context in Which the TSA was Negotiated.

TERI concedes that evidence of context should ordinarily be considered, prior to deciding whether a contract is unambiguous. TERI Br. at 30. The evidence of context strongly supports FMC's interpretation of the TSA.

a. At the time the TSA was negotiated, TERI needed FMC's cooperation. As TERI admits (TERI Br. at 7, 8), TERI had to find a way to drastically reduce its costs. It could reject its pre-existing agreements with FMC, but it had to arrange for a smooth transition of functions from FMC to TERI. Although TERI states that there is no record support for this fact (TERI Br. at 23), at the Bankruptcy Court hearing at which the Court considered TERI's Rejection Motion, TERI's counsel said: ". . . the transition services agreement . . . basically provides for those services that we *need* First Marblehead to continue for us until we're able to undertake them on our own." Record 17 at 8 (emphasis supplied). And, "we *need* to finish processing loans that were, as we've described it, in the pipeline . . . First Marblehead will continue to do that for us . . . ." Record 17 at 8-9. At the same hearing, FMC's lawyer said "[a]s soon as these [FMC] agreements are rejected there is no way that, unless there is a transition services agreement . . . to deal with the servicing of those many loans." Record 17 at 18. TERI's lawyer did not disagree.[14]

In sum, TERI needed FMC's cooperation, and it would have had to offer something of value to FMC to secure its cooperation.

b. The database that FMC provided to TERI consisted of data that TERI owned <u>and</u> data and features that FMC had added to the database. TERI asserts that this fact is unsupported (TERI Br. at 23-24), but the TSA itself states that FMC would provide to TERI data "owned by TERI," as well as data beyond that which was "owned by TERI." <u>See</u> p. 14, <u>supra</u>. Precisely

---

[14] If TERI did not need the transitional services that FMC provided, it would have unilaterally rejected the FMC Contracts and not replaced them with the TSA.

because FMC was providing a database that included data and features that FMC had added, a permanent restriction on TERI's right to sell or transfer that enhanced database was both reasonable and consistent with the facts as they existed in 2008. Conversely, TERI's suggestion that FMC would have given TERI data that belonged to FMC and also have agreed, as TERI now contends, to a shortening of the period of the restrictions on TERI's use of the enhanced database -- from 2013 to 2010 -- is inconsistent with rational business conduct.

      c.     TERI needed the database that FMC had maintained. TERI had not maintained its own data in useful, organized, searchable fashion. TERI contends, erroneously, that this fact is unsupported. TERI Br. at 24.[15] But, if TERI already possessed TERI's own data in a useful format, it would have had no reason to ask FMC to transfer FMC's version of the database. The inescapable conclusion is either that TERI no longer had a useable database, or that TERI wanted access to the data added by FMC -- or both. Thus, FMC had something that TERI wanted, and believed it needed. FMC was, therefore, in a position to bargain for, and obtain, something in return -- an extension of the restrictions on TERI's use of the enhanced database.

      d.     The only benefit that FMC received from the TSA was an extension of the time period during which the existing restrictions on TERI's use of the database would continue to apply. The only other benefit to FMC that TERI suggests (TERI Br. at 8, 24, 29) is TERI's agreement to release cash to certain trusts -- cash that it had previously obligated itself to provide to the trusts to secure TERI's (not FMC's) obligations to purchase defaulted student loans from those trusts. Although TERI now touts this undertaking as a benefit to FMC, in 2008, it told the Bankruptcy Court something else. It explained that it was simply "turning . . . back to the secured party" -- *i.e.*, the trusts -- the collateral in which those trusts already had "a security interest." Record 17 at 24:13-15.

---

[15] TERI's repeated assertion (TERI Br. at 24, 28) that FMC was obligated to maintain a database for TERI is unsupported by TERI's citation to the record, or by any other evidence of record. In particular, no such obligation is stated in the parties' 2001 Database Agreement. Record 95 at Ex. 2.

e.      At the time the TSA was negotiated in 2008, the restriction on TERI's use of the database was a restriction under which TERI had operated since 2001, without apparent difficulty.  TERI could use the database to support its loan guarantee business, but it could not sell or transfer the database to a third person.  It would have been easy for TERI to agree to remain subject to that familiar restriction.  Moreover, an extension of the period of the restriction was not inconsistent with what was then TERI's future plan for its business.  At the time when it sought authorization to enter into the TSA, TERI told the Bankruptcy Court and FMC that its future plans called for "a new [student loan] guarantee model that's collateral-based."  Record 17 at 7.  TERI also said that it "expects to become cash flow positive" by "entering into agreements with lenders . . . to design loan programs to be supported by a non-recourse (except to collateral) TERI guarantee."  Record 9 (Affidavit of TERI CEO Hulings In Support Of TERI's Motion For Authorization To Enter The TSA) at 8.  The existing provision regarding TERI's use of the enhanced database would have permitted its use in connection with such a business.  As a result, the temporal extension of the existing rules governing TERI's conduct -- the extension stated in Section 3.13 of the TSA -- would have imposed no constraint on TERI's future plans as they then existed, but would have afforded additional protection to FMC.  For this separate reason, it was a reasonable agreement for the parties to make.

TERI's argument (TERI Br. at 2, 10-11) that the agreed restriction on TERI's use of the enhanced database is inconsistent with TERI's current business plans is beside the point.  In the context of interpreting the TSA, it is the parties' intentions as they existed, and were articulated, at the time that the TSA was negotiated that matter; not TERI's changed intention two and one-half years later.  See Polaroid Corp. v. Rollins Envtl. Servs., 416 Mass. 684, 694 (1993).[16]

---

[16] The argument about its current plans is also misleading.  A significant part of TERI's post-confirmation business activity will be to assist the Plan Trust to collect defaulted student loans for the ultimate benefit of TERI's creditors.  Record 44 at 30-31.  As FMC's prior brief explains (FMC Mem. at 10), and as TERI does not dispute, the parties' Stipulation allows TERI to use the enhanced database for that purpose.

In sum, at the time the TSA was negotiated, TERI needed FMC's cooperation in order to reject the FMC Contracts and, thus, to save millions of dollars per month without destroying what remained of TERI's business. In addition, TERI needed, or wanted, the enhanced database that included both TERI data (that TERI had failed to maintain itself) and FMC data. At that time, TERI had been living under a set of restrictions on its use of the database for years. A permanent continuation of those long-standing restrictions was consistent with TERI's business plan as it then existed, and it was substantially the only consideration that FMC received for entering into the TSA. It provided reasonable protection for FMC against the sale by TERI of FMC's data to a third party. The Bankruptcy Court should have considered this evidence of the context in which the TSA was negotiated. TERI concedes that a contract must be considered in the context in which it was entered. TERI Br. at 30. The Bankruptcy Court's failure to hear or consider evidence of context was error.

## 2.    The Negotiation of the TSA.

The Bankruptcy Court did not entertain evidence of the communications that constituted the negotiation of the TSA. As a result, there is little evidence of record with respect to those communications. What is clear is that TERI's counsel drafted Section 3.13 of the TSA -- the permanent survival provision -- and did so close to the end of the parties' negotiation of the TSA. See FMC Mem. Ex. B. TERI does not explain why TERI would have drafted (much less agreed to) such a provision if, as TERI now claims, the TSA already contained a two-year survival provision, and the provision that its counsel drafted was pure surplusage.

TERI argues repeatedly that FMC did not tell the Bankruptcy Court at the hearing at which TERI sought authorization to enter into the TSA that the TSA extended the existing restrictions on TERI's use of the Loan Database. TERI Br. at 2, 9 , 11-12, and 30. The argument is another diversion. The subject of data and the Loan Database was not discussed by anyone at the hearing on TERI's Rejection Motion. Record 17. There was no reason for FMC's

counsel to address a subject that TERI's counsel had not raised in TERI's Motion or at that hearing. Moreover, TERI's Rejection Motion attached the TSA and did not attach the 2001 Database Agreement. Record 3. Thus, the Court would have understood from the papers that TERI had submitted to it (a) that, in accordance with Section 2.1 of the TSA, the pre-existing restrictions on TERI's use of the Loan Database were to continue, and (b) that, in accordance with Section 3.13 of the TSA, those restrictions were to survive termination of the TSA without limit. No other understanding was possible in view of the materials that were then before the Court. FMC can hardly be criticized for not having the prescience to foresee in 2008 that TERI would assert in 2010 that a contract that TERI did not attach to its motion and did not mention at the relevant hearing, included a provision that actually changed the apparent meaning of the document that TERI did present to the Bankruptcy Court. TERI's argument that FMC's counsel did not respond in 2008 to an argument that TERI did not make in 2008 is unworthy.[17]

### 3. Post-Contractual Conduct.

TERI now argues (a) that the Loan Database is an asset of great value and (b) that TERI is free to transfer the database to a third party because all restrictions on its use of the database have lapsed. If that assertion were correct, TERI was obligated to disclose this valuable asset when it sought approval of its Plan. 11 U.S.C. § 1125(a) and (b). When TERI sought approval of its Plan, TERI submitted to creditors an "analysis of the proceeds that may be generated as a result of a hypothetical liquidation of the assets of the debtor." Record 81, Best Interests Analysis pp. 2-7. The enhanced database is not even mentioned.

---

[17] If anything, TERI's conduct in connection with its Rejection Motion cuts against TERI's present position. TERI now contends that the enhanced database, when freed from the contractual restrictions on its use, is a valuable asset. TERI states that its Rejection Motion "expressly included [*i.e.*, described] the principal terms of the TSA." TERI Br. at 8. If, as TERI now contends, TERI succeeded in significantly shortening the period of those restrictions by rejecting the 2001 Database Agreement and negotiating the TSA, one would expect that TERI would have identified that supposedly important benefit, in its Rejection Motion or at the hearing on that Motion, as a reason why the Bankruptcy Court should authorize it to reject the 2001 Database Agreement and enter into the TSA. It did not. See Record 3 and 17.

TERI argues that, until shortly before Plan confirmation, FMC did not assert that the restrictions on TERI's use of the database were permanent. TERI Br. at 12, 32.[18] TERI's argument is both impermissible and wrong. It is impermissible because it is a factual assertion about the communications that occurred, or did not occur, between the parties. The existence/non-existence, and the content of, any such communications should have been the subject of testimony. However, the Bankruptcy Court declined to hear testimony. TERI is wrong because the evidence of record establishes that the issue was a matter of contention between the parties more than a year prior to Plan confirmation. See, e.g., Record 63 (FMC's Annual Report on Form 10-K for the year ended June 30, 2009) at 28.

Finally, TERI's argument that there is a "total absence from the two and one-half year record of the Chapter 11 case of any articulation of the permanent restriction theory" (TERI Br. at 13) is misleading. There is also a "total absence from the two and one-half year record" of any assertion by TERI of its early termination of restrictions theory. Neither party asserted a position on the record regarding the length of the restriction on TERI's use of the enhanced database until a hearing held on October 8, 2010 -- at which point the parties asserted the positions that they each continued to argue after TERI's plan of reorganization was confirmed. The argument that TERI makes against FMC cuts back with equal force against TERI -- and thus ultimately leads nowhere.[19]

---

[18] In the Bankruptcy Court, TERI made that same assertion, but in a way that reveals the hollow character of its argument. It said that FMC "never claimed in a pleading or other writing (*not subject to Rule 408 of the Federal Rules of Evidence*) that TERI did not have the right to use its own data . . . ." Record 95 at 15 (emphasis supplied).

[19] TERI's contention that it needs the enhanced database to support its vaguely defined "portfolio management business" is, for the reasons stated above, irrelevant. It is also unsupported. TERI does not describe that business or explain why it needs the enhanced database to conduct such a business. TERI cites the testimony of its expert, James Peko, as the basis for its argument. TERI Br. at 11. In fact, Mr. Peko testified that he knew almost nothing about TERI's portfolio management business. See, e.g., Record 67 at 144-148. He acknowledged that TERI's entire revenue from the portfolio management business had been $25,000. Id. at 147. And, when Mr. Peko was asked whether the database was important to TERI's future operations, Mr. Peko declined to so testify:

## <u>CONCLUSION</u>

For the reasons stated above and in FMC's prior memorandum, the Bankruptcy Court's December 14, 2010 Order should be vacated, on the ground that the Bankruptcy Court did not have jurisdiction to enter that Order, and this case should be dismissed.  In the alternative, if this Court concludes that the Bankruptcy Court did have jurisdiction to decide TERI's Post-Confirmation Motion, it should reverse the Bankruptcy Court's December 14, 2010 Order and remand the case to the Bankruptcy Court, with a direction to allow discovery and, thereafter, to conduct an evidentiary hearing before ruling on TERI's Post-Confirmation Motion.

Respectfully submitted,

THE FIRST MARBLEHEAD CORPORATION, FIRST MARBLEHEAD EDUCATION RESOURCES, INC., and FIRST MARBLEHEAD DATA SERVICES, INC.

By their counsel,

/s/ Robert S. Frank, Jr.
Robert S. Frank, Jr. (BBO# 177240)
*rfrank@choate.com*
Douglas R. Gooding (BBO# 558976)
*dgooding@choate.com*
William S. McMahon (BBO# 651832)
*wmcmahon@choate.com*
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts  02110
Tel:  (617) 248-5000
Fax:  (617) 248-4000

Dated:  March 30, 2011

---

Q.  Would you say that TERI believes that the size and quality of its database of student loan collections is one of its competitive advantages?

A.  I would say that TERI believes that its depth and -- and knowledge in the student loan market provides at [it] a competitive advantage.

<u>Id</u>. at 159-160.

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that the Reply Brief of Appellants The First Marblehead Corporation, First Marblehead Education Resources, Inc., and First Marblehead Data Services, Inc., filed through the ECF system, was sent via electronic mail to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 30th day of March, 2011.

/s/ Robert S. Frank, Jr.
Robert S. Frank, Jr. (BBO # 177240)
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
Tel:  (617) 248-5000
Fax:  (617) 248-4000

4832687v1