UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| FIRST MARBLEHEAD CORPORATION, FIRST MARBLEHEAD EDUCATION RESOURCES, INC., and FIRST MARBLEHEAD DATA SERVICES, INC., | ) ) ) ) ) ) | |
| Appellants, | ) ) | Civil Action NO. 11-10241-DPW |
| v. | ) ) | |
| THE EDUCATION RESOURCES INSTITUTE, INC., | ) ) ) | |
| Appellee. | ) ) ) ) | |

MEMORANDUM AND ORDER
December 8, 2011

First Marblehead Corporation, First Marblehead Education Resources, Inc., and First Marblehead Data Services, Inc. (collectively "FMC") appeal a Bankruptcy Court order interpreting an agreement between FMC and The Education Resources Institute, Inc. ("TERI").  FMC argues that the Bankruptcy Court did not have subject matter jurisdiction to decide the meaning and effect of the agreement, and that even if it did, its interpretation was erroneous.  Concluding that the Bankruptcy Court properly retained jurisdiction over the dispute and that its resolution on the merits was appropriate, I affirm.

## I.  BACKGROUND

### A.  *Factual Background*

TERI is a nonprofit organization that promotes access to education.  Since its inception in 1985, TERI has been in the

business of processing and guaranteeing education loans originated by private lenders.  In 2001, TERI entered into a series of transactions with FMC.  FMC offers "outsourcing services to national and regional financial institutions and educational institutions in the United States for designing and implementing private education loan programs."

Pursuant to the agreements between the parties, TERI paid FMC a fee to undertake risk management, administrative, and support functions for TERI, and to provide origination services and securitization of loans guaranteed by TERI.  The agreements between TERI and FMC included the Master Servicing Agreement, the Master Loan Guaranty Agreement, the Marketing Services Agreement, and the Database Sale and Supplemental Agreement (the "Database Agreement").

Under the Database Agreement, the only agreement at issue in this appeal, TERI agreed to transfer a database of information it had collected regarding loans and default rates to FMC and to support FMC's maintenance of the database.  Database Agreement, art. III, June 20, 2001, Record 95, Ex. 2.  In exchange, FMC agreed to tender up-front and monthly payments.  *Id.* art. IV. The transferred information - the "Delivered Database" - is a subset of the "Loan Database," which is defined in the agreement as consisting "of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection

with its business as a loan guarantor . . . ." *Id.* art. 1, §§
3.01, 3.02.

The Database Agreement placed restrictions on FMC's use of
the Delivered Database and TERI's use of both the Delivered
Database and the Loan Database. *Id.* §§ 2.02, 2.03.   Under §
2.03, TERI agreed that

> during the term of this Agreement it will use the Loan
> Database, and/or its retained copy of the Delivered
> Database only for the Retained Uses.   Specifically, but
> not by way of limitation, TERI will not sell, license
> or transfer, the Loan Database or any substantial
> portion thereof to any person nor will it disclose the
> same except in furtherance of the Retained Uses.

The "Retained Uses" are defined as "the right retained by TERI to
utilize the original version of the Loan Database . . . for its
own use for purposes of designing, underwriting, implementing,
evaluating and managing education loan guarantee programs." *Id.*
art. I.   These provisions essentially allowed TERI to use the
Loan Database in furtherance of its own loan guarantee activities
but prohibited it from selling or licensing it to third parties.

Under § 10.01 of the Database Agreement, the restrictions in
§§ 2.02 and 2.03, as well as § 2.01 and Articles VIII, IX and X,
which are defined as the "Surviving Obligations," "survive
termination of [the Database] Agreement for a period of two years
after the termination date." *Id.* art. I, § 10.01.   The Database
Agreement was to last up to ten years, terminating June 20, 2011.
*Id.* § 5.02.

After entering into the agreements with FMC, TERI continued to guarantee and securitize student loans and earn fees for those activities.  However, by the spring of 2008, the financial crisis had dried up the market for securities backed by student loans, and TERI's revenue dropped significantly.  On March 26, 2008, TERI's issuer rating was downgraded, causing a lender to demand the segregation of reserves to its loans guaranteed by TERI.  *Id.* ¶ 17.  TERI could not meet the reserve requirement without jeopardizing its ability to meet other obligations and decided to file a Chapter 11 petition on April 7, 2008.

**B.  *Bankruptcy Proceedings and Transition Services Agreement***

Two months after initiating the bankruptcy proceeding, TERI requested an order from the Bankruptcy Court authorizing it to reject the agreements with FMC and enter into a Transition Services Agreement ("TSA").  In its motion, TERI explained that it could no longer operate under the fee structure of its various agreements for outsourcing services to FMC.  In order to allow TERI to transition away from reliance on FMC, the parties negotiated the TSA, pursuant to which FMC would supply certain essential services at a reduced cost for up to four months.

On June 23, 2008, the Bankruptcy Court issued an order (the "June 2008 Order") granting the motion.  The June 2008 Order provided:

> ORDERED, that the Debtor the FMC Contracts [sic] are rejected effective of May 31, 2008; and it is further

> ORDERED, that each of the FMC Entities may treat each
> of the FMC Contracts as terminated as of May 31, 2008,
> and it is further
>
> ORDERED, that the Debtor is authorized to enter into
> the Transition Services Agreement, as amended, between
> the Debtor and the FMC Entities, which Transition
> Services Agreement will govern the relationship of the
> Parties from June 1, 2008 forward, and its further
> . . .
>
> ORDERED, that this Court will retain jurisdiction to
> construe and enforce the terms of this Order.

*Id.*

In addition to providing for FMC's provision of certain transitional services, the TSA required that FMC transfer to TERI "the data comprising the Loan Database (as defined in the Loan Database)," Transition Services Agreement, § 2.1, which was still owned by TERI, but was being maintained by FMC.

The TSA authorized FMC to continue to possess and use the Delivered Database it had received pursuant to the Database Agreement and maintained the restrictions on FMC and TERI's use of data as follows:

> Notwithstanding the rejection or other termination of
> the Database Agreement, (I) FMER [an FMC entity First
> Marblehead Education Resources, Inc.] shall continue to
> possess all right, title and interest in and to the
> Delivered Database (as defined in the Database
> Agreement), including the right to use and possess the
> Delivered Database and the right to share the data with
> FMC, to disclose the data to others, to copy and
> manipulate the data and generally to exercise ownership
> of the Delivered Database and all modifications and
> enhancements thereof and (ii) the Loan Database
> transferred from FMER to TERI pursuant to Section 2.1
> of this Agreement shall remain subject to sections 2.01
> (Grant), 2.02 (FMER Restrictions) and 2.03 (TERI
> Restrictions) of such Database Agreement and any and

> all additional terms of the Database Agreement that
> pursuant to section 10.01 of the Database Agreement
> survive termination of such agreement and remain in
> full force and effect.

*Id.* § 2.1.  Section 3.13 provides that Article II, which includes

§ 2.1, "shall survive termination of this Agreement."

Over two years later, on October 29, 2010, the Bankruptcy

Court approved a Reorganization Plan for TERI to emerge from

bankruptcy proceedings and continue operations.

### C.  *The Database Dispute*

On October 7, 2010, prior to approval of the Reorganization

Plan, FMC, TERI, and the Official Committee of Unsecured

Creditors entered into a joint motion for approval of a

stipulation resolving FMC's claims against TERI.  The motion

noted that a "Database Dispute" between FMC and TERI remained

unresolved.  In an October 18, 2010 hearing regarding the

stipulation and other matters before the Bankruptcy Court, TERI

referenced the Database Dispute and TERI's intention to file a

motion for the resolution of the issue.

In summary, the Database Dispute concerns whether the TSA

imposes a permanent restriction on TERI's use of the Loan

Database, rather than the two-year restriction described in the

Database Agreement.  FMC argues that §§ 2.1 and 3.13 of the TSA

permanently limit TERI's use of the database to the "Retained

Uses" described in the Database Agreement at § 2.03.  TERI

disputes this interpretation, arguing that the TSA did not

permanently restrict its use of the Loan Database but rather confirmed the two-year post-termination survival of § 2.03 found in § 10.01 of the Database Agreement.

On November 2, 2010, TERI filed a "Motion for Interpretation of Order" requesting that the Bankruptcy Court interpret its June 2008 Order approving the TSA, in order "to preclude the First Marblehead Entities from asserting that restrictions on TERI's use of Data and TERI's obligations to indemnify the First Marblehead Entities have not expired and that the Court otherwise enforce the Contracts Order."  FMC objected to the motion, disputing TERI's interpretation and arguing that the Bankruptcy Court lacked subject matter jurisdiction because it had already issued its confirmation order for the reorganization plan.

On December 14, 2010, the Bankruptcy Court issued a Memorandum of Law addressing TERI's motion.  As to jurisdiction, it found that it had subject matter jurisdiction over the motion because it retained jurisdiction over the interpretation of the TSA through its June 2008 Order.  As to the merits, it concluded that, under the plain reading of the TSA, § 2.1 incorporates the Database Agreement's two-year survival of the use restrictions and did not make such restrictions permanent.

## II.  STANDARD OF REVIEW

Appellate review of conclusions of law by a bankruptcy Court are *de novo*.  *See Stornaway Fin. Corp. v. Hill* (*In re Hill*), 562 F.3d 29, 32 (1st Cir. 2009) (noting that the Bankruptcy appellate

panel, the district court, and the court of appeals all review a bankruptcy court's conclusions of law *de novo*).  Both of the issues on appeal – the presence of subject matter jurisdiction and the interpretation of the TSA to the degree it is unambiguous – involve conclusions of law.  Bankruptcy courts, however, are entitled to substantial deference in the interpretation of their own arguably ambiguous orders.  *See Travelers Indemnity Co. v. Bailey*, 129 S.Ct. 2195, 2204 n.4 (2009).

## III.  ANALYSIS

### A.  *Subject Matter Jurisdiction*[1]

By statute, district courts[2] have "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."  28 U.S.C. § 1334(a)-(b).  "A case under title 11," subject to the exclusive jurisdiction of the district courts "is the bankruptcy petition itself, such as a Chapter 11 reorganization."  *New*

---

[1]   The Supreme Court has recently decided a sequence of cases addressing the subject matter jurisdiction of bankruptcy courts.  *See Stern v. Marshall,* 131 S. Ct. 2594, 2620 (2011); (holding that bankruptcy courts lack "the constitutional authority to render a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim"); *Marshall v. Marshall*, 597 U.S. 293 (2006).  Although instructive, none of the recent decisions are on point for the issues in this case.

[2]   District courts may refer bankruptcy proceedings to bankruptcy judges under 28 U.S.C. § 157, as the District of Massachusetts has by general reference.  D. Mass. Local R. 201**.**

*England Power & Marine, Inc. v. Town of Tyngsborough* (*In re Middlesex Power Equip. & Marine, Inc.*), 292 F.3d 61, 66 (1st Cir. 2002). "Arising under" proceedings are "those cases in which the cause of action is created by title 11," while "'arising in' proceedings generally are 'those that are not based on any right expressly created by title 11, but nevertheless would have no existence outside of the bankruptcy;" *Id.* at 68 (quoting *Wood v. Wood* (*In re Wood*), 825 F.2d 90, 96 (5th Cir. 1987)). The First Circuit has defined the last category of cases over which 28 U.S.C. § 1334(c) grants jurisdiction - "related to" proceedings - as those "which 'potentially have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact on the handling and administration of the bankrupt estate.'" *Id.* (quoting *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (internal quotation omitted)).

    Rather than rely on the grant of jurisdiction in 28 U.S.C. § 1334, the Bankruptcy Court and TERI both primarily contend that the June 2008 Order, which states that the Bankruptcy Court "will retain jurisdiction to construe and enforce the terms of this Order," is sufficient to confer subject matter jurisdiction over TERI's motion requesting an interpretation of the TSA.[3]

--------

    [3]  The Bankruptcy Court distinguished the instant case from those where no "related to" jurisdiction was found, implying that "related to" jurisdiction is present here as well. The Bankruptcy Court found it "unnecessary to wade into the murky

The resolution of the question whether the Bankruptcy Court retained jurisdiction over the interpretation of the TSA requires the application of two principles – first, that a court's interpretation of its own order is afforded deference by a reviewing court, and second, that in order to retain jurisdiction over an agreement, a court's order must either incorporate the terms of the agreement or include a provision retaining jurisdiction over the approved agreement.  I find that the Bankruptcy Court had subject matter jurisdiction over TERI's motion because both principles are applicable here.

1.   The Bankruptcy Court's Interpretation of its Order

The Supreme Court indicated in *Travelers* that bankruptcy

---

waters of post-confirmation jurisdiction jurisprudence" since it had reserved jurisdiction in the June 2008 Order.  Because I too find that the Bankruptcy Court's June 2008 Order retained jurisdiction over the interpretation of the TSA, I will not comprehensively analyze the existence of "related to" jurisdiction.  However, I must note my reservation that it is unlikely that "related to" jurisdiction exists here because it does not appear that the interpretation of the TSA would have an impact on the administration of the bankrupt estate.  The dispute was resolved after the plan of reorganization had been approved and "courts sometimes have found a need to curtail the reach of related to jurisdiction . . . so that bankruptcy court jurisdiction does not continue indefinitely."  *Boston Reg'l Med. Ctr. Inc. v. Reynolds* (*In re Boston Reg'l Med. Ctr., Inc.*), 410 F.3d 100, 106 (1st Cir. 2005).  Although in certain circumstances, such as liquidation proceedings, a broader view of post-confirmation "related to" jurisdiction may be appropriate, *id.* at 106-107, TERI has presented no such justification here.  Furthermore, after *Stern v. Marshall*, 131 S. Ct. 2594 (2011), there is some question whether the bankruptcy court could make a final determination using "related to" jurisdiction absent consent of the parties.  As noted above, however, I need not address that issue because the June 2008 Order was sufficient to confer jurisdiction on the bankruptcy court.

courts are entitled to substantial deference in the interpretation of their own orders.  There, a bankruptcy court issued an "Insurance Settlement Order" enjoining potential claimants from bringing suits against Travelers Indemnity Co. ("Travelers"), and other of the Debtor's insurers, for "any and all claims, demands, allegations, duties, liabilities and obligations . . . which have been or could have been, or might be, asserted . . . against [insurers] based upon, arising out of or relating to any or all of the Policies." *Travelers*, 129 S.Ct. at 2199.  The Insurance Settlement Order was incorporated into the Confirmation Order, collectively the "1986 Orders."  *Id.* at 2199-2200.

Over a decade after confirmation, a number of claims were made directly against Travelers for its own conduct on behalf of the Debtor insured.  *Id.* at 2200.  Travelers sought declaratory relief from the bankruptcy court under the 1986 Orders, and the bankruptcy court concluded that the claims against Travelers were barred by the 1986 Orders.  *Id.* at 2201.  On review, the Supreme Court held that the bankruptcy court had continuing jurisdiction to interpret its own orders and agreed with its interpretation, finding the terms of the 1986 Orders unambiguous and noting "that a court should enforce a court order, a public governmental act, according to its unambiguous terms."  *Id.* at 2204; *see also Negrón-Almeda v. Santiago*, 528 F.3d 15, 23 (1st Cir. 2008) ("[A]

court must carry out and enforce an order that is clear and
unambiguous on its face.").

Although it held that the terms of the 1986 Orders were
unambiguous, the Court also observed that:

> Even if we found the 1986 Orders to be ambiguous as
> applied to the [claims at issue], and even if we
> concluded that it would be proper to look to the
> parties' communications to resolve that ambiguity, it
> is far from clear that respondents would be entitled to
> upset the Bankruptcy Court's interpretation of the 1986
> Orders.  Numerous Courts of Appeals have held that a
> bankruptcy court's interpretation of its own
> confirmation order is entitled to substantial
> deference. . . . Because the 1986 Orders clearly cover
> the [claims], we need not determine the proper standard
> of review.

*Travelers*, 129 S.Ct. at 2204 n.4 (collecting cases).[4]

In summary, the Supreme Court in *Travelers* described a two-
step process for the review of a bankruptcy court's suggested
interpretation of its own order.  First, if a bankruptcy court's
order is unambiguous, the plain meaning must be given effect.
Second, if the reviewing court finds that the order is ambiguous,
the court must undertake an additional step of review, giving the
bankruptcy court's interpretation substantial deference.

The Supreme Court in *Travelers* relied in part on *Monarch
Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973 (1st Cir. 1995), where

---

[4]  Although the Supreme Court referred specifically to
confirmation orders, two of the circuit court cases it cited
involved orders of dismissal.  *See Casse v. Key Bank Nat'l Ass'n
(In re Casse)*, 198 F.3d 327 (2d Cir. 1999); *Colonial Auto Center
v. Tomlin (In re Tomlin)*, 105 F.3d 933 (4th Cir. 1997).  As a
result, I find no reason to limit the Court's observations to
confirmation orders.

the First Circuit held that "customary appellate deference is appropriate" when the bankruptcy court is "interpreting its own order of confirmation." *Id.* at 983.  Several other circuits reviewing bankruptcy courts' interpretations have applied an abuse of discretion standard. *See, e.g., In re Shenango*, 501 F.3d 338, 345-46 (3d Cir. 2007); *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 675 (6th Cir. 2006); *Finova Capital Corp. v. Larson Pharmacy Inc. (In re Optical Techs., Inc.)*, 425 F.3d 1294, 1300 (11th Cir. 2005); *Enodis Corp. v. Emp'rs Ins. of Wausau (In re Consol. Indus.)*, 360 F.3d 712, 716 (7th Cir. 2004); *Gen. Elec. Capital Corp. v. Dial Bus. Forms (In re Dial Bus. Forms, Inc.)*, 341 F.3d 738, 744 (8th Cir. 2003).

The First Circuit has not explicitly addressed the precise standard of deference applicable in these circumstances, but in *Monarch Life*, it cited cases affording "full deference," *In the Matter of Weber*, 25 F.3d 413, 416 (7th Cir. 1994) (internal quotation omitted), "substantial deference," *William B. Schnach Ret. Trust v. Unified Capital Corp. (In re Bono Development, Inc.)*, 8 F.3d 720, 722 (10th Cir. 1993), and reviewing for "abuse of discretion," *Texas N. W. Ry. Co. v. Diamond Shamrock Refining & Mktg. Co. (In the Matter of Chicago, Rock Island & Pacific R. Co.)*, 865 F.2d 807, 810 (7th Cir. 1988) (internal quotation omitted). *Monarch Life*, 65 F.3d at 983 n.12.  Although it is unclear which articulation of the standard the First Circuit will

13

ultimately embrace, any distinctions among them are immaterial to my review of the Bankruptcy Court's interpretation of the June 2008 Order because the same outcome would result no matter which I apply.

FMC argues that the Bankruptcy Court improperly interpreted the *TSA*, and not its own June 2008 Order.  The Bankruptcy Court actually undertook two layers of interpretation grounded in the June 2008 Order.  First, it construed its June 2008 Order as retaining jurisdiction over the interpretation of the TSA, and second, it interpreted the relevant terms of the TSA.  I too will apply the two-step analysis.  I address the first layer of the Bankruptcy Court's interpretation in this section and address the second layer in Section III.B.

As an initial matter, I do not find the June 2008 Order to be ambiguous.  The Bankruptcy Court "ORDERED, that the Debtor is authorized to enter into the Transition Services Agreement, as amended, between the Debtor and the FMC Entities, which Transition Services Agreement will govern the relationship of the Parties from June 1, 2008 forward," and retained "jurisdiction to construe and enforce the terms of this Order."  The plain reading of "the terms of this Order" must include the TSA, which is specifically referenced in the June 2008 Order and which TERI attached to the motion requesting the authorization.  This specific reference to the TSA is sufficient to satisfy me that

the agreement must be interpreted as part of the terms of the
June 2008 Order in which the Bankruptcy Court retained
jurisdiction.

Even were I to find the June 2008 Order ambiguous, I would
defer to the Bankruptcy Court's interpretation.  However, such
deference must be considered against the backdrop of the
requirements applicable to orders that retain jurisdiction over
an agreement where jurisdiction may not otherwise exist.  As a
result, I will canvas the jurisprudence on that topic before
reaching a conclusion on whether the Bankruptcy Court's
interpretation of its own arguably ambiguous order should be
afforded deference.

2.  Retention of Jurisdiction Under *Kokkonen*

FMC challenges the retention of jurisdiction asserted by the
Bankruptcy Court under *Kokkonen v. Guardian Life Ins. Co. of
America*, 511 U.S. 375 (1994).  In *Kokkonen*, a non-bankruptcy
case, the parties to a dispute in district court came to a
settlement agreement which they recited on the record before the
court.  *Id.* at 376-77.  Following this resolution, the parties
executed a stipulation and order for the dismissal of the
complaint and cross-complaint.  *Id.* at 377.  The district court
signed the stipulation and order, which "did not reserve
jurisdiction in the District Court to enforce the settlement
agreement; indeed it did not so much as refer to the settlement

agreement." *Id.* Thereafter, the parties disputed the obligations under the agreement, and one party moved for the district court's enforcement of the agreement. *Id.* The district court entered an enforcement order, purporting to rely upon its "inherent power" to do so. *Id.*

The Supreme Court found that the district court had no such "inherent power" because (1) the facts underlying the dismissed claim and those underlying the breach of the settlement agreement were unrelated, and (2) the only order of the court at issue "was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement." *Id.* at 380-81. As a result, the enforcement of the agreement was not related to the enforcement of the district court's order. The Court noted that:

> The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal — either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

*Id.* at 381.

Under *Kokkonen*, "a federal court does not have inherent jurisdiction to enforce a settlement merely because it presided over the law suit that led to the settlement," *F.A.C., Inc. v. Cooperative de Seguros de Vida de Puerto Rico*, 449 F.3d 185, 189

(1st Cir. 2006), nor does it have jurisdiction to interpret such an agreement.  *Sea Hawk Seafoods, Inc. v. State of Alaska* (*In re Valdez Fisheries Dev. Ass'n, Inc.*), 439 F.3d 545, 549-50 (9th Cir. 2006).  Accordingly, FMC argues that the Bankruptcy Court's June 2008 Order is insufficient under *Kokkonen* to retain jurisdiction over the interpretation of the TSA and that it therefore lacks subject matter jurisdiction.

The First Circuit in *F.A.C.* examined a district court's order of dismissal to determine whether that order satisfied the requirement in *Kokkonen* for the retention of jurisdiction to adjudicate disputes related to the settlement agreement.  The Court observed that "[h]ard and fast rules" regarding the sufficiency of language retaining jurisdiction "may be unwise because of variations in language and context."  *Id.* at 190.  In *F.A.C.*, the First Circuit found the order sufficient to retain jurisdiction because it described the district court's participation in settlement discussions, summarized the settlement agreement, resolved a dispute as to its terms, and referenced the settlement agreement with the following language: "[a]s per the terms of the settlement agreement and Fed. R. Civ. P. 41(a)(2), the Amended Complaint is hereby DISMISSED with prejudice."  *Id.* 189-90 (internal quotation omitted).  The First Circuit concluded that the district court had retained jurisdiction even though the order did not do so explicitly.  *See*

17

*also Fafel v. Dipaola*, 399 F.3d 403, 414 (1st Cir. 2005) (holding that a judgment under Fed. R. Civ. P. 68 "necessarily incorporates the terms of the underlying offer, with or without the additional measures prescribed in *Kokkonen*").

Here, in its Memorandum, the Bankruptcy Court explained that:

> The TSA, which was attached to the Contracts Motion and carefully reviewed by this Court before it entered the Contracts Order, provides that, as a condition precedent to the effectiveness of the TSA, this Court 'shall have entered a final order in form and substance reasonably acceptable to [First Marblehead] *approving this Agreement* . . . .' TSA, § 1.4(c) (emphasis supplied). There is no question but that the Contracts Order did just that — it did not merely authorize TERI to enter into the TSA, but, as understood by the Court, TERI, *and First Marblehead*, it approved the terms of the TSA and retained jurisdiction to construe and enforce those terms.

Applying *Kokkonen* to the order at issue here, and considering the fact that specific language is not required for the retention of jurisdiction, I find the Bankruptcy Court's interpretation to be reasonable and entitled to substantial deference.

FMC emphasizes that "mere awareness and approval of the terms of the settlement agreement do not suffice to make them part" of an order. *Kokkonen*, 511 U.S. at 381; *see also Sea Hawks*, 439 F.3d at 549-50 (holding that even though an agreement required the approval of the bankruptcy court, such approval alone was insufficient to retain of jurisdiction). Here, the Bankruptcy Court refers to its review and approval of the TSA, as

18

well as a requirement in the TSA that it issue an order of approval; thus, here the approval forms both the basis and the background for the Bankruptcy Court's jurisdiction.

In addition to the June 2008 Order's plain language, the Bankruptcy Court considered the context and language of the June 2008 Order, as well as the Court's and parties' understanding at the time. The Bankruptcy Court's approach is consistent with *Kokkonen* and its application in this Circuit. *See F.A.C.*, 449 F.3d at 190; *Municipality of San Juan v. Rullan*, 318 F.3d 26, 31 (1st Cir. 2003) (finding the "mutual consent of the parties" relevant to determination whether a district court retains jurisdiction over an action). In particular, and unlike the order of the district court in *Kokkonen*, the June 2008 Order explicitly referenced the TSA and retained jurisdiction.

I find that the Bankruptcy Court's interpretation is not at odds with *Kokkonen*; it did not assert inherent power to interpret the TSA, but rather explained that it had retained jurisdiction in the June 2008 Order. Even if I were somehow to find the June 2008 Order somehow did not plainly incorporate the terms of the TSA or retain jurisdiction over that agreement, I would defer to the Bankruptcy Court's reasonable interpretation of its own Order that in fact it did so.

## B. *Interpretation of the TSA*

Having found that the Bankruptcy Court had subject matter jurisdiction over the interpretation of the TSA, I now turn to

the merits of the interpretation itself.  Under Massachusetts law a "court interprets a contract that is free from ambiguity according to its plain meaning." *S. Union Co. V. Dep't of Pub. Utils*, 941 N.E.2d 633, 640 (Mass. 2011).  A contract term "is ambiguous 'only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.'"  *Id.* (quoting *Citation Ins. Co. v. Gomez*, 688 N.E.2d 951, 953 (Mass. 1998)).  I agree with the Bankruptcy Court that the TSA unambiguously incorporates the two-year limit on the Data Use Restrictions and other Surviving Obligations.

Section 2.1 of the TSA obligates FMC to transfer the Loan Database in its possession to TERI, grants FMC certain rights in the Delivered Database, restricts TERI's use of the Loan Database, and provides for certain terms in the Database Agreement.  The interaction between the TSA and the incorporated terms in the Database Agreement requires a close reading of the two agreements.

As an initial matter, although FMC claims that the distinction between the "Loan Database" and the "Delivered Database" is immaterial to the instant dispute, that position does not comport with the language of TSA § 2.1.  The first paragraph of § 2.1 requires FMC to deliver to TERI the "Loan Database (as defined in the Database Agreement," while § 2.1(I) confers to FMC the rights to the "Delivered Database (as defined in the Database Agreement)."  Section 2.1(ii) states that the

"*Loan Database transferred from FMER to TERI* shall remain subject to [§§ 2.01, 2.02, and 2.03] of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to § 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect." (emphasis added.)  The unambiguous reading of § 2.1 is that the provisions of the Database Agreement apply to the Loan Database transferred from FMC to TERI, but not to the *Delivered Database* retained by FMC.

The distinction between the two databases, with respect to the survivability of the Database Agreement terms, comports with the apparent understanding of both parties that FMC's rights to the Delivered Database are permanent while the restrictions on the use of the Loan Database are temporary.  Due to inartful drafting, this interpretation may render the reference to § 2.02 of the Database Agreement superfluous because that term only restricts FMC's use of the Delivered Database and does not concern the Loan Database.  However, the only reasonable reading is that FMC received all rights to the Delivered Database, while the Loan Database remained subject to provisions of the Database Agreement.

Given this construction of § 2.1 of the TSA, I now turn to the question of how long the restrictions incorporated in § 2.1(ii) survive.  FMC's position is that the plain meaning of the reference to § 10.01 merely incorporates the "Surviving

21

Obligations" and not the two-year time limit.  This argument
fails for at least three reasons.

First, although the reference to § 10.01 within § 2.1 is
vague and, standing alone, may not clearly incorporate both the
referenced surviving obligations as well as the two-year time
limit on those obligations, a close examination of the two
agreements reveals that the only reasonable understanding is that
the two-year time limit applies to the surviving obligations.
Section 2.1 (ii) provides that, in addition to §§ 2.01, 2.02, and
2.03, "any and all additional terms of the Database Agreement
that pursuant to section 10.01 of the Database Agreement survive
termination of such agreement and remain in full force and
effect."  It may be possible through a strained reading to treat
this sentence as merely referencing the "Surviving Obligations"
subject to § 10.01 and providing that they survive indefinitely.
However, as the Bankruptcy Court pointed out, § 10.01 does not
itself define which provisions survive termination.  "Surviving
Obligations" are defined in Article I, while § 10.01 explains
that they survive for two years.  As a result, a reference to the
definition of "Surviving Obligations" would be more appropriate
if the two-year limit was not being incorporated.  Further,
regardless of whether § 2.1 incorporates the two-year time limit
directly, one of the "Surviving Obligations" is Article X, which
includes § 10.01, and to give § 10.01 "full force and effect,"

22

the "Surviving Obligations" may only last for two years after the termination of the Database Agreement.

Second, although FMC argues that the two-year time limit would render § 3.13 superfluous, § 3.13 has meaning and effect even in light of the incorporation of the two-year time limit. Section 3.13 refers to the entire Article II, which includes those provisions of § 2.1 not subject to § 10.01, i.e., the first paragraph and § 2.1(I), as well as § 2.2.  Further, even if the two-year limit applied to the entirety of Article II, nothing in § 3.13 requires that the provisions survive indefinitely, and so the two-year limitation in § 10.01 would be consistent with § 3.13.

Third, the TSA adopts the definition of "Loan Database" set out in the Database Agreement, which provides that the Loan Database:

> consists of any and all data now or hereafter obtained, generated, recorded, or otherwise received by TERI in connection with its business as a loan guarantor, including, without limitation, borrower data such as credit scores and other credit information, loan payment histories and statistics, default and recovery data, data regarding schools attended by borrowers and students whose education was financed with TERI-guaranteed loans, and underwriting criteria.

Database Agreement, art. I.  Under this definition, and FMC's assertion that TERI's use of the Loan Database is restricted for all time, TERI would not be able to sell or transfer data to a third party even if it were to create a completely new database of information related to its loan guarantee business.  The plain

reading of the TSA does not contemplate such a perpetual constriction of TERI's future activities.

## IV.  CONCLUSION

For the reasons outlined above, I conclude that, acting within its subject matter jurisdiction, the Bankruptcy Court properly ruled that the Surviving Obligations in the Database Agreement, incorporated by reference in the TSA, do not extend beyond two years following the termination of the Database Agreement.  As a result, I AFFIRM the Bankruptcy Court's Order of December 14, 2010.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE